# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 8, 2024          Decided November 22, 2024

No. 23-5129

ALPINE SECURITIES CORPORATION,
APPELLANT

v.

FINANCIAL INDUSTRY REGULATORY AUTHORITY AND UNITED
STATES OF AMERICA,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cv-01506)

*Brian W. Barnes* argued the cause for appellant. With him
on the briefs were *Maranda E. Fritz*, *David H. Thompson*, and
*Athanasia O. Livas*.

*William P. Barr*, *Noel J. Francisco*, *Brian C. Rabbitt*, and
*Anthony J. Dick* were on the brief for *amicus curiae* American
Free Enterprise Chamber of Commerce in support of appellant.

*Russell G. Ryan* and *Andrew Morris* were on the brief for
*amicus curiae* New Civil Liberties Alliance in support of
appellant.

*Carrie Devorah*, *pro se*, was on the brief for *amicus curiae* Carrie Devorah in support of appellant.

*Amir C. Tayrani* argued the cause for appellee Financial Industry Regulatory Authority. With him on the brief were *Alex Gesch* and *Max E. Schulman*.

*Joseph F. Busa*, Attorney, U.S. Department of Justice, argued the cause for intervenor appellee United States. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Mark B. Stern* and *Courtney Dixon*, Attorneys. *Gerard J. Sinzdak*, Attorney, entered an appearance.

*Zachary Knepper* was on the brief for *amicus curiae* North American Securities Administrators Association, Inc. in support of appellees.

*Alan L. Rosca* was on the brief for *amicus curiae* Public Investor Advocate Bar Association in support of appellee.

*Adam G. Unikowsky*, *Elizabeth B. Deutsch*, and *Arjun R. Ramamurti* were on the brief for *amici curiae* National Futures Association, *et al.* in support of appellee.

*David S. Flugman* was on the brief for *amicus curiae* Benjamin P. Edwards in support of appellee.

*Adam L. Deming*, *Mark D. Harris*, and *Margaret A. Dale* were on the brief for *amici curiae* the Depository Trust Company, *et al.* in support of appellees.

*Kevin King* and *Daniel G. Randolph* were on the brief for *amicus curiae* Securities Exchanges in support of appellee.

*Pratik A. Shah* and *Lide E. Paterno* were on the brief for *amicus curiae* Horseracing Integrity and Safety Authority, Inc. in support of appellee.

*Jonathan E. Barbee* and *Robert K. Kry* were on the brief for *amicus curiae* Municipal Securities Rulemaking Board in support of neither party.

Before: SRINIVASAN, *Chief Judge*, MILLETT and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Opinion concurring in the judgment in part and dissenting in part filed by *Circuit Judge* WALKER.

MILLETT, *Circuit Judge*: The United States securities industry is regulated by both private entities and the federal government. These private regulators, referred to as self-regulatory organizations, date back centuries to when groups of securities traders adopted self-governing rules by which they would conduct business and ensure public trust in their operations.

Today, a private corporation, the Financial Industry Regulatory Authority ("FINRA"), regulates and oversees large parts of the securities industry. Congress, however, has overlain federal law on those private self-regulatory practices. As relevant here, federal law effectively requires most firms and individuals that trade securities to join FINRA as a condition of engaging in that business. Federal law, in turn, subjects FINRA to oversight by the Securities and Exchange Commission ("SEC") and requires that FINRA ensure that its members comply both with FINRA's own rules and with federal securities laws.

In 2022, FINRA sanctioned one of its members, Alpine Securities Corporation, for violating FINRA's private rules for member behavior and imposed a cease-and-desist order against Alpine. Alpine then sued in federal court, challenging FINRA's constitutionality.

While that lawsuit was pending, FINRA concluded that Alpine had violated the cease-and-desist order and initiated an expedited proceeding to expel Alpine from membership in FINRA. Alpine then sought a preliminary injunction from the district court against the expedited proceeding, arguing that FINRA is unconstitutional because its expedited action against Alpine violates either the private nondelegation doctrine or the Appointments Clause. The district court denied the preliminary injunction.

We now reverse only to the extent the district court allowed FINRA to expel Alpine with no opportunity for SEC review. Alpine is entitled to that limited preliminary injunction because it has demonstrated that it faces irreparable harm if expelled from FINRA and the entire securities industry before the SEC reviews the merits of FINRA's decision. Alpine has also demonstrated a likelihood of success on its argument that the lack of governmental review prior to expulsion violates the private nondelegation doctrine. We accordingly hold that FINRA may not expel Alpine either before Alpine has obtained full review by the SEC of the merits of any expulsion decision or before the period for Alpine to seek such review has elapsed.

At the same time, we hold that Alpine has not demonstrated that it will suffer irreparable harm from participating in the expedited proceeding itself as long as FINRA cannot expel Alpine until after the SEC conducts its own review. For that reason, Alpine has not shown that it is

entitled to a preliminary injunction halting that proceeding altogether.

As this case comes to us in a preliminary-injunction posture, we necessarily do not resolve the ultimate merits of any of Alpine's constitutional challenges, and our determination about Alpine's likelihood of success on the private nondelegation issue is based only on the early record in this case. We leave it to the district court on remand to determine the ultimate merits of Alpine's claims.

## I

### A

By way of background, the securities industry in the United States has engaged in extensive self-regulation for more than two centuries. Efforts to create organized, self-policing stock markets in the United States began in the late eighteenth century. *See* Stuart Banner, *The Origin of the New York Stock Exchange, 1791–1860*, 27 J. LEGAL STUD. 113, 114–115 (1998). The earliest effort came in 1791, when securities traders in New York agreed to abide by fourteen rules. *Id.* at 114. Those rules created auction procedures, required employment of a stockbroker, and developed a means for enforcing sales contracts. *Id.* at 114–115. Participants to the agreement who violated the rules would be barred from future transactions with other participants. *Id.* at 115. After the stock market crashed in 1792, these fourteen rules were succeeded by the well-known 1792 Buttonwood Agreement, in which a group of New York traders agreed, among other things, to regulate stock trade commissions. *Id.* As the story goes, the traders signed that agreement in the shade of a buttonwood tree—though that part of the story may be apocryphal. *See id.* at 115 n.3.

Following the War of 1812, New York securities brokers, sensing an opportunity to make money trading in federal debt securities, organized themselves into the New York Stock and Exchange Board, known today as the New York Stock Exchange. Banner, *supra*, at 115. Their first constitution set minimum commissions on trades, imposed rules for trading, and set membership criteria. *See* Constitution of the New York Stock & Exchange Board (1817), https://perma.cc/E5WA-FHR6. The constitution also provided that a member who refused to comply with its rules could have a hearing before the Board and could be expelled if it continued to violate the rules. *Id.* § 15. Traders in other cities soon followed suit, forming the Boston and Philadelphia stock exchanges by 1835. Banner, *supra*, at 116.

These exchanges functioned as private regulators in the early American securities industry. The New York Stock and Exchange Board took on an outsized role as the foremost stock exchange in the country. Banner, *supra*, at 119. Among other things, it adopted membership criteria, promulgated rules with which members had to comply, and developed a quasi-judicial system that employed panels of exchange members for adjudicating disputes. *Id.* at 120–126, 132–133. Members who violated the exchange's rules, such as by breaching sales contracts, could be suspended or expelled from the exchange and barred from doing business with its members. *Id.* at 122. In this way, the exchange both facilitated securities trading and promoted an image of trustworthiness and credibility to the public. *Id.* at 123, 140. This entire self-regulatory scheme was private, with the exchange funded through membership fees. *Id.* at 116.

**B**

For the next century, the securities industry remained largely autonomous.  Then, after the catastrophic 1929 stock market crash and the ensuing Great Depression, Congress passed a series of laws regulating the securities industry, including the Securities Exchange Act of 1934, Pub. L. No. 73–291, 48 Stat. 881 (codified as amended at 15 U.S.C. § 78a *et seq.*) ("Exchange Act").  The Exchange Act created the Securities and Exchange Commission, a federal agency tasked with overseeing and regulating the securities industry.  Exchange Act § 4, 48 Stat. at 885.  In addition to direct rulemaking authority, Congress gave the SEC a supervisory role over private exchanges and required them to register with the SEC and to comply with the SEC's orders.  Exchange Act §§ 6, 19, 48 Stat. at 885–886, 898–899; *see* Marianne K. Smythe, *Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws*, 62 N.C. L. REV. 475, 482–483 (1984).

Congress later realized that the SEC was underequipped to regulate securities trading that was taking place off the exchanges through informal networks of securities traders. *See* Smythe, *supra*, at 483.  To address that problem, Congress passed the Maloney Act of 1938, Pub. L. No. 75–719, 52 Stat. 1070 (1938) (codified as amended in scattered sections of 15 U.S.C.).  Rather than expand the SEC, Congress took what it saw as a "distinctly preferable" route:  Creating a system of "cooperative regulation," in which the task of regulating securities traders would "be largely performed by representative organizations of investment bankers, dealers, and brokers[.]"  S. REP. NO. 75–1455, at 4 (1938).  The SEC would take on a supervisory role by "exercising appropriate supervision in the public interest, and exercising supplementary powers of direct regulation."  *Id.*  As Justice

Douglas put it while chair of the SEC, the self-regulatory model of securities regulation permits private entities to "take the leadership with Government playing a residual role." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 128 (1973) (quoting WILLIAM O. DOUGLAS, DEMOCRACY AND FINANCE 82 (J. Allen ed. 1940)).

To achieve its goal of "cooperative regulation," the Maloney Act established "registered securities associations"— self-regulatory organizations registered with the SEC that are composed of brokers and dealers. *See* 15 U.S.C. § 78*o*-3. These organizations are required to adopt rules for their members to follow and to enforce both their own rules and federal securities laws against their members. *See id.* § 78*o*-3(b).

In 1939, the National Association of Securities Dealers ("NASD") became the nation's first registered securities association. Smythe, *supra*, at 477–478, 483–485. NASD's initial rules required its members to "observe high standards of commercial honor and just and equitable principles of trade," and prohibited members from "mak[ing] improper use of a customer's securities or funds." Paul S. Grant, *The National Association of Securities Dealers: Its Origin and Operation*, 1942 WIS. L. REV. 597, 602–603 (1942). NASD also regulated the commissions that its members could charge, generally deeming commissions above five percent to be unreasonable. *In the Matter of the Rules of the Nat'l Ass'n of Sec. Dealers, Inc.*, Exchange Act Release No. 3574, 1944 WL 26641, at *1 (S.E.C. June 1, 1944).

Since 1938, Congress has repeatedly amended the Exchange Act to bolster the self-regulatory scheme by increasing government oversight while preserving self-regulatory organizations' primary role in regulating the

securities industry. *See* S. REP. NO. 94–75, at 22 (1975) (noting "the sheer ineffectiveness of attempting to assure [regulation] directly through the government on a wide scale"). The most significant of these amendments came in 1975 and 1983.

In 1975, "Congress initiated a major overhaul of the Exchange Act and drastically shifted the balance of rulemaking power in favor of Commission oversight." *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1129 (9th Cir. 2005). The 1975 amendments require self-regulatory organizations to submit rule changes to the SEC for approval before they can go into effect. *Id.* at 1130; *see* 15 U.S.C. § 78s(b)(1). The SEC may also "abrogate, add to, and delete from" self-regulatory organizations' rules. 15 U.S.C. § 78s(c).

Then, in 1983, Congress made joining a self-regulatory organization mandatory for virtually all securities traders. Pub. L. No. 98–38, § 3, 97 Stat. 205 (1983). The SEC, however, retains the authority to exempt individual traders from that membership requirement. 15 U.S.C. § 78*o*(b)(9).

## C

Today, FINRA is the only registered securities association in the United States. FINRA was formed after the SEC approved a merger between NASD and the New York Stock Exchange's enforcement arm. 72 Fed. Reg. 42,169, 42,169 (Aug. 1, 2007). FINRA is organized as a Delaware nonprofit corporation operated by private individuals and receives no funding from the federal government. Like early self-regulatory organizations, FINRA is financed entirely through "fees, fines, penalties, and sanctions levied against its members." Second Am. Compl. ¶¶ 41, 52–53.

As required by federal law, FINRA promulgates rules for its members to follow. Some of FINRA's rules are almost

word-for-word identical to NASD rules from the 1930s and 1940s.  For example, FINRA, like the NASD in 1939, requires members to "observe high standards of commercial honor and just and equitable principles of trade."  FINRA Rule 2010; *see* NASD Rule 1 ("A member * * * shall observe high standards of commercial honor and just and equitable principles of trade."), *reprinted in* Grant, *supra*, at 602.  FINRA's rules also carry forward NASD's prohibition on members "mak[ing] improper use of a customer's securities or funds."  FINRA Rule 2150(a); *see* NASD Rule 19(a) ("No member shall make improper use of a customer's securities or funds."), *reprinted in* Grant, *supra*, at 603 n.3.  In addition, FINRA continues to use NASD's five-percent policy, which generally considers commissions greater than five percent to be unreasonable.  *See* FINRA Rule 2121; FINRA Rule 2121 Supplementary Material .01 ("The [Five-Percent] Policy has been reviewed by the Board of Governors on numerous occasions and each time the Board has reaffirmed the philosophy expressed in 1943.").

Under the Exchange Act, FINRA must enforce its rules against its members and "provide a fair procedure for" disciplining members who violate FINRA rules.  15 U.S.C. §§ 78*o*-3(b)(2), (7)–(8).   FINRA must also ensure that members comply with the Exchange Act and SEC rules and regulations.  *Id.*

Typical FINRA enforcement actions take place before an internal FINRA panel and may involve multiple levels of review.  *See Saad v. SEC*, 873 F.3d 297, 300 (D.C. Cir. 2017).  FINRA members may appeal to a FINRA appellate body, the decisions of which may also be reviewed by the FINRA Board.  *Id.*  Final FINRA decisions may be appealed to the SEC, which generally performs "its own review of the disciplinary action," and may modify, affirm, or set aside any part of FINRA's decision.  *Id.*; 15 U.S.C. § 78s(e)(1).  Finally, FINRA members

can petition a court of appeals for review of an adverse SEC decision.  15 U.S.C. § 78y(a)(1).

FINRA rules separately provide for expedited disciplinary proceedings for certain types of misconduct, including violating a previously issued FINRA order.  *See* FINRA Rules 9556, 9559.  These expedited proceedings have more compressed timelines and generally involve less internal review.  *See* FINRA Rule 9559(f)(2) (requiring a hearing within ten days after a member is served notice).  Appellate review of expedited proceedings within FINRA is discretionary.  *See* FINRA Rule 9559(q).  Violators may still appeal to the SEC from the final FINRA decision, but "[t]he filing of an application for review by the SEC shall not stay the effectiveness of final FINRA action, unless the SEC otherwise orders."  FINRA Rule 9559(r).

## II

### A

Alpine Securities Corporation is a securities broker-dealer, meaning that it trades securities on behalf of others and for itself.  *See* 15 U.S.C. § 78c(a)(4)–(5).  Alpine is a member of FINRA.

In 2018, Alpine's finances took a turn for the worse.  Alpine attributed its financial troubles in part to an earlier SEC enforcement action against Alpine for violation of federal securities laws that culminated in a $12 million civil penalty against Alpine for "egregious * * * [and] illegal conduct on a massive scale."  *See SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 245 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 68 (2d Cir. 2020).  To stem its losses, Alpine adopted a new business model, ending individual retail investment services and imposing significantly higher fees.

Alpine's revamped business model attracted scrutiny from FINRA. After Alpine customers complained to FINRA about the firm's fees, FINRA opened an investigation and then charged Alpine by complaint in August 2019. App. 164. A FINRA disciplinary panel concluded that Alpine had violated a litany of FINRA rules. The panel found that Alpine's new fees—including a $5,000 monthly account fee that was a 600-fold increase from Alpine's prior $100 annual account fee—were unreasonable. App. 192, 195. The panel also found that Alpine had charged several types of fees that, when combined, "resulted in unfair and excessive prices and commissions" that were "well in excess of 5%, and in many instances well in excess of 10% per trade." App. 219–221. In addition, the panel found that Alpine misappropriated customer property by seizing customer-owned securities, App. 201, 206, and violated liquidity rules when it made an unauthorized withdrawal of over $600,000 from Alpine's funds to pay an unprecedentedly large "bill" owed to an Alpine affiliate, App. 226, 228. FINRA's findings involved violations only of FINRA's own internal rules; FINRA did not find that Alpine had violated federal securities laws or regulations.

Deeming Alpine's misconduct "intentional and egregious," the FINRA panel expelled Alpine from FINRA, issued a cease-and-desist order prohibiting Alpine from charging the fees and commissions the panel had held were unreasonable, and ordered it to pay restitution to injured customers. App. 240, 243, 246–248. Alpine appealed to FINRA's internal appellate body, which automatically stayed the expulsion order. FINRA Br. 13; *see* FINRA Rule 9311(b). That appeal is still pending before FINRA.

Alpine's appeal within FINRA did not stay the cease-and-desist order against it because that order became final when the panel issued it. FINRA Br. 13–14; *see* FINRA Rule 9311(b).

Alpine could have appealed that order to the SEC, FINRA Rules 9370, 9870, but chose not to and so that order went into and remains in effect.

**B**

Alpine and an affiliate business subsequently sued FINRA in the United States District Court for the Middle District of Florida, challenging FINRA's constitutionality. Alpine raised challenges under the private nondelegation doctrine, Appointments Clause, First Amendment, Fifth Amendment, and Seventh Amendment. The United States intervened to defend the constitutionality of the relevant parts of federal securities law, such as the general requirement that a trader be a member of a self-regulatory organization as a condition of doing business. *See* 15 U.S.C. § 78*o*(b)(1). The district court in Florida subsequently transferred the case to the United States District Court for the District of Columbia.

While Alpine's suit was pending, FINRA received reports that Alpine was continuing to charge fees and commissions in violation of the unchallenged cease-and-desist order. FINRA Br. 14. FINRA's enforcement department then opened a second investigation that led to FINRA initiating an expedited disciplinary proceeding against Alpine. FINRA's complaint alleged that Alpine had violated the cease-and-desist order more than 35,000 times by charging over $4 million in unreasonable fees and commissions. App. 251. The complaint alleged only violations of internal FINRA rules; it did not allege any violations of federal securities laws or regulations.

FINRA's enforcement department sought Alpine's immediate expulsion from FINRA. App. 265.[1]

Back in district court where its lawsuit against FINRA was pending, Alpine sought a preliminary injunction against FINRA's expedited proceeding. The district court denied that request. *Scottsdale Cap. Advisors Corp. v. FINRA*, 678 F. Supp. 3d 88, 94 (D.D.C. 2023). As relevant here, the court held that FINRA is a private entity and not part of the government, so the Appointments Clause does not apply to its personnel. *Id.* at 106. Next, the court held that FINRA does not violate the private nondelegation doctrine because the SEC can review all FINRA decisions. *Id.* at 107.[2]

This court granted Alpine an emergency injunction pending appeal, enjoining FINRA's expedited proceeding

---

[1] Alpine's conduct and allegedly repeated violations over multiple years are not at issue in this preliminary injunction or this appeal. We therefore express no view on any of FINRA's decisions or allegations, including whether Alpine committed the conduct FINRA found or alleged, whether Alpine's conduct violated any FINRA rules, or what, if any, sanctions would be appropriate.

[2] The district court also rejected Alpine's claims under the First, Fifth, and Seventh Amendments. *Scottsdale*, 678 F. Supp. 3d at 106, 108. Alpine does not raise those claims on appeal. Because Alpine does not press its Seventh Amendment claim here, the Supreme Court's recent decision in *Securities and Exchange Commission v. Jarkesy*, 144 S. Ct. 2117 (June 27, 2024), does not affect our resolution of this interlocutory appeal. *See id.* at 2127–2128 ("The Seventh Amendment therefore applies and a jury is required. Since the answer to the jury trial question resolves this case, we do not reach the nondelegation or removal issues.").

against Alpine. *Alpine Sec. Corp. v. FINRA*, No. 23-5129, 2023 WL 4703307, at *1 (D.C. Cir. July 5, 2023).

**III**

The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). A party requesting a preliminary injunction must show that (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) the issuance of a preliminary injunction "is in the public interest." *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022) (quoting *Winter*, 555 U.S. at 20).

We review the district court's weighing of those preliminary-injunction factors for an abuse of discretion. We review any questions of law underlying the decision *de novo*. *Abdullah v. Obama*, 753 F.3d 193, 197–198 (D.C. Cir. 2014).

**IV**

Alpine makes its two constitutional arguments in the alternative—either (1) FINRA is a private entity that the government has invested with too much power, in violation of the private nondelegation doctrine, or (2) FINRA is a governmental entity, in which case its expedited proceeding violates the Appointments Clause of the Constitution. We begin with Alpine's private nondelegation argument, which challenges the Exchange Act's assignment of some regulatory role to FINRA, a private entity. In doing so, we assume without

deciding that FINRA and the United States are correct that FINRA is not a governmental entity.

We hold that Alpine is entitled to a limited preliminary injunction because it has demonstrated a likelihood of success on the merits of its private nondelegation claim to the extent that FINRA can unilaterally expel a member and, in so doing, bar the expelled entity from engaging in stock trading, all without governmental superintendence or control. Given that federal securities law generally transforms FINRA's membership decision into a flat legal prohibition on trading securities at all, the absence of SEC review before such a decision takes effect likely runs afoul of the private nondelegation doctrine, which requires that a private entity statutorily delegated a regulatory role be supervised by a government actor. In addition, the remaining preliminary-injunction factors favor granting an injunction. Alpine faces potential expulsion from FINRA, which effectively amounts to being barred from the securities industry. Under federal law, expulsion would likely put Alpine out of business, and would do so before the SEC performs a full review of FINRA's decision.

## A

To begin, we find that Alpine has demonstrated that it is likely to prevail on its private nondelegation claim to the extent that FINRA's expulsion decision can, due to federal law, expel it from the securities industry. *See Winter*, 555 U.S. at 20.

## 1

Congress has long delegated regulatory authority to private entities. For example, in the early 1800s, Congress delegated significant economic regulatory authority to the Bank of the United States, a private entity, including the

authority to control the United States' money supply. Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 YALE L.J. 1836, 1883 (2015) (cited in FINRA Br. 23–24); *see* ALEXANDER HAMILTON, REPORT ON A NATIONAL BANK (Dec. 13, 1790) (arguing that a national bank was needed to augment the United States' money supply and to issue standardized currency), *available at* https://perma.cc/6QE4-NRH8; 13 REG. DEB. 440, 442 (1837) (Sen. James Buchanan) (describing the Bank's control of the money supply and calling the Second Bank of the United States the "regulator of the currency"); *see also* Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 STAN. L. REV. 443, 531 (2018) ("Congress saw the bank as a public-private nongovernmental entity.") (cited in Alpine Opening Br. 47; FINRA Br. 23–24). Similarly, "[f]or as long as the eminent domain power has been exercised by the United States, it has also been delegated to private parties." *PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 483 (2021); *see Luxton v. North River Bridge Co.*, 153 U.S. 525, 529 (1894).

For a delegation of governmental authority to a private entity to be constitutional, the private entity must act only "as an aid" to an accountable government agency that retains the ultimate authority to "approve[], disapprove[], or modif[y]" the private entity's actions and decisions on delegated matters. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940); *see Association of American R.R.s v. Department of Transp.*, 721 F.3d 666, 671 (D.C. Cir. 2013) (*Amtrak I*), *vacated on other grounds*, 575 U.S. 43 (2015); *see also Association of American R.R.s v. Department of Transp.*, 896 F.3d 539, 546 (D.C. Cir. 2018) (private delegation constitutional where government agency "exercise[s] authority and surveillance" over the private entity) (quotation marks omitted); *Oklahoma v. United States*, 62 F.4th 221, 228–229 (6th Cir. 2023) (similar); *National Horsemen's Benevolent &*

*Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) (similar); *Walmsley v. Federal Trade Comm'n*, 117 F.4th 1032, 1039–1040 (8th Cir. 2024) (Where a statute gives the government agency "broad power to subordinate the [private entity's] enforcement activities, the statute is not unconstitutional in all of its applications.").

Typically, SEC oversight of FINRA disciplinary actions involves the SEC "conduct[ing] its own review" of any final decision or sanction. *Saad*, 873 F.3d at 300; *see* 15 U.S.C. § 78s(e); *see also PAZ Sec., Inc. v. SEC*, 494 F.3d 1059, 1064 (D.C. Cir. 2007) (Federal law requires the SEC "to review *de novo* a disciplinary sanction imposed by [FINRA.]"). That review includes an "independent review of the record" to determine whether the FINRA member "engaged in the conduct FINRA found," "whether that conduct violated the rules specified in FINRA's determination," and whether the discipline otherwise accords with the Exchange Act. *Devin Lamarr Wicker*, Exchange Act Release No. 100148, 2024 WL 2188603, at *7 (S.E.C. May 15, 2024). In addition, the SEC can approve, disapprove, or modify FINRA's actions. *Saad*, 873 F.3d at 300; 15 U.S.C. § 78s(e)(1)(A).

**2**

Review of expulsions imposed through FINRA's expedited proceedings, however, functions differently. Alpine has shown, on the record before us, that the SEC does not exercise ultimate control over FINRA's decisions to expel its members in expedited proceedings because those orders take effect immediately, before the SEC can review them, and the severe consequences associated with expulsion can make any later review by the SEC a largely academic exercise.

To begin, the SEC does not conduct any review of an expulsion order in an expedited proceeding before it goes into

effect. Under FINRA rules, an expulsion takes effect immediately upon the issuance and "prompt" service of FINRA's decision. FINRA Rules 9360, 9559(*o*)(5), (q)(4)–(5). Federal law, on the other hand, specifies that SEC review must wait until *after* FINRA has issued its final decision and imposed any sanction. 15 U.S.C. § 78s(d)(1)–(2). Taken together, those provisions mean that SEC review can come only after, not before, the expulsion takes effect.

Yet delayed SEC review of expulsion orders will almost always be too little too late. With limited exceptions, federal law prohibits entities from trading securities unless they are a member of a registered securities association. 15 U.S.C. § 78*o*(b)(1). FINRA is the only such association in the United States, meaning that, as a practical matter, securities traders must be members of FINRA to conduct their business. As a result, expulsion from FINRA effectively amounts to expulsion from the securities industry as a whole. Expelled FINRA members may not trade securities on behalf of themselves or their clients. Barred from pursuing their trade, many expelled FINRA members could be forced out of business before they can obtain SEC review of the merits of FINRA's decision. That is the fate that Alpine claims will befall it. *See* Decl. of Maranda E. Fritz ¶ 7, ECF 46 (May 9, 2023) ("An expulsion order against Alpine * * * would force Alpine to close its business."); *see also* Oral Arg. Tr. 58:5–8 (FINRA's counsel explaining that Alpine would violate the Exchange Act if it continued to trade securities after expulsion).

To be sure, the SEC can stay the effectiveness of an expulsion order. *See* 15 U.S.C. § 78s(d). But the SEC's stay authority likely is insufficient to satisfy the constitutional requirements of meaningful SEC merits review for two reasons.

First, a stay is not automatic. Under both FINRA rules and federal law, petitioning the SEC for review does not itself stay an expulsion order. FINRA Rule 9559(r); 15 U.S.C. § 78s(d)(2); 17 C.F.R. § 201.420(d). Instead, unless the SEC chooses to act on its own, the expelled FINRA member must file a separate written request for a stay after filing its application for SEC review, *see* 17 C.F.R. §§ 201.401(a), (d), and prove that it is entitled to a stay. While the SEC rules provide that it will expedite consideration of stay requests, *see id.* § 201.420(d)(3), the process still takes time, during which the total bar on securities trading will already be taking its toll.

At oral argument, counsel for FINRA represented that the SEC granted Alpine a stay in two business days in a prior FINRA disciplinary matter. Oral Arg. Tr. 58:10–14. That is a quick turnaround, but that stay appears to have been the discretionary issuance of an interim, administrative stay just to allow for full consideration of Alpine's stay motion. *Alpine Sec. Corp.*, Exchange Act Release No. 86719, 2019 WL 3933691, at *1 (S.E.C. Aug. 20, 2019). Plus, this preliminary record does not reveal how often such interim stays are entered or the standard for their issuance. Full consideration of stay motions appears to take longer, with the SEC taking weeks or even months before acting. *See, e.g.*, *Michael Clark*, Exchange Act Release No. 92521, 2021 WL 3210138, at *1 (S.E.C. July 29, 2021) (denying stay three months after filing); *Scottsdale Cap. Advisors Corp.*, Exchange Act Release No. 83783, 2018 WL 3738189, at *1 (S.E.C. Aug. 6, 2018) (granting stay two weeks after filing). Because expulsion from FINRA carries with it a moratorium on all securities trading, even a few days or weeks may be too long for an expelled FINRA member to stay afloat.

Stays are also not easily obtained. Like courts, the SEC starts from the premise that a stay is an "extraordinary

remedy." *Michael Clark*, 2021 WL 3210138, at \*2 (quotation marks omitted; citing *Nken v. Holder*, 556 U.S. 418, 432 (2009)). The party seeking the stay bears the burden of proof and must demonstrate that (1) it has a "strong likelihood" of success on the merits; (2) it will suffer irreparable harm without a stay; (3) no other party will suffer substantial harm as a result of a stay; and (4) a stay is likely to serve the public interest. *NYPPEX, LLC*, Exchange Act Release No. 100177, 2024 WL 2289209, at \*1 (S.E.C. May 20, 2024). If an expelled member cannot make that extraordinary showing and persuade the SEC to exercise its discretion to grant a stay, then no timely SEC review will be available.

To be sure, *if a stay is granted*, the ensuing SEC review would be plenary. *See PAZ Sec.*, 494 F.3d at 1064. But that "if"—and the time it takes to get there—means that *no* SEC review takes place until after the effects of any expulsion have been felt.

Second, the SEC's granting or denying of a stay is not a decision on the merits. The private nondelegation doctrine requires that a government actor be able to "approve[], disapprove[], or modif[y]" a private actor's decisions on delegated matters. *See Adkins*, 310 U.S. at 388, 399; *Amtrak I*, 721 F.3d at 671. In reviewing a stay application, however, the SEC does none of those things. Instead, the SEC has been explicit that a decision on a stay application does not decide the merits, and that "[a]ny final resolution must await the Commission's determination of the merits of [the underlying] appeal." *Scottsdale Cap. Advisors*, 2018 WL 3738189, at \*4 (quoting *Bloomberg L.P.*, Exchange Act Release No. 83755, 2018 WL 3640780, at \*7 (S.E.C. July 31, 2018)); *see Alpine Sec.*, 2019 WL 3933691, at \*1 ("[O]ur determination to grant this interim stay should not be interpreted as suggesting that we have decided any matter regarding this appeal[.]").

The result of this regulatory scheme is that FINRA can, without any SEC review of its decision on the merits, effectively decide who can trade securities under federal law. Due to FINRA's current expedited-hearing process, the SEC statutorily cannot review expulsion orders before they go into effect and may be unable or unwilling to grant a stay so that it can meaningfully review a decision before it goes into effect and the expelled member's business collapses.

So if the SEC reviews FINRA's expulsion orders at all, it does so only through a stay proceeding that disfavors immediate relief for the expelled member and does not decide the merits. That falls short of what the private nondelegation doctrine requires: an accountable government actor that "retains the discretion to approve, disapprove, or modify" FINRA's delegated decisions. *Amtrak I*, 721 F.3d at 671 (formatting modified); *see Adkins*, 310 U.S. at 388.

The government points out that the SEC has some statutory authority to waive the requirement that a trader be a member of a registered securities association. *See* 15 U.S.C. § 78*o*(b)(9). But even after this court invited supplemental briefing, the SEC has made no showing that Alpine could obtain such a waiver, let alone while FINRA's expedited proceeding against it is pending and before an expulsion order could issue.

**3**

The dissenting opinion favors a broader injunction that would prevent FINRA from policing its member's misconduct at all. In doing so, the dissenting opinion goes far beyond even Alpine's nondelegation arguments. Remember that FINRA is not enforcing any federal law or SEC regulation against Alpine in the underlying proceeding. Yet the dissenting opinion reasons that FINRA nonetheless runs afoul of the private

nondelegation doctrine by exercising "significant executive authority" when it enforces *its own private rules* against a member and seeks remedies against that member that run only to FINRA, and not to the government. Dissenting Op. at 13–15.

That is incorrect on multiple fronts. To start, remember that, in this case, FINRA is not alleging or seeking to enforce any federal law or regulation. Its complaint is that Alpine failed to comply with a prior FINRA cease-and-desist order that rested solely on findings of non-compliance with FINRA's internal rules. App. 250–265. And Alpine chose not to seek SEC review of that cease-and-desist order. With the exception of the expulsion order addressed above, the dissenting opinion's list of activities that it equates with the exercise of "significant executive authority" refers simply to FINRA's own internal procedures for investigating member compliance with FINRA's membership rules. In addition, any fines ordered by FINRA are paid to FINRA, not to the United States Treasury. Second Am. Compl. ¶¶ 41, 52–53; Financial Guiding Principles, FINRA, at 2, https://perma.cc/SAB6-CZ49. Many of those measures, including the conduct of investigative hearings, *predate* any congressional involvement with private securities regulators. Banner, *supra*, at 123–124 (fines); Constitution of the New York Stock & Exchange Board § 15 (hearings). They are not an authority bestowed by the federal government.

Next, the dissenting opinion raises a nondelegation argument that Alpine itself has not advanced. So that cannot provide a likelihood of success to support injunctive relief. *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004) (arguments not raised on appeal are forfeited).

Finally, the dissenting opinion's reasoning melds the private nondelegation doctrine with Alpine's Appointments Clause arguments. The latter, though, is where the Supreme Court has housed the "significant executive authority" inquiry on which the dissenting opinion relies. *See Lucia v. SEC*, 585 U.S. 237, 245–246 (2018); *Freytag v. Commissioner*, 501 U.S. 868, 881-882 (1991); *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) ("[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of [Article II].") (quoting U.S. Const. Art. II, § 2, cl. 2); *see also Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 506 (2010).

The dissenting opinion notably cites just one district court opinion applying its "significant executive authority" test to a private nondelegation challenge. Dissenting Op. at 8 n.28. An argument never advanced by the party requesting a preliminary injunction and unsupported by a single case from the Supreme Court, this court, or any appellate court cannot establish the likelihood of success necessary to permit the issuance of a preliminary injunction.

**B**

The remaining preliminary-injunction factors—irreparable harm, the balance of equities, and the public interest—also support Alpine.

Alpine faces irreparable harm because it faces a grave risk of being forced out of business before full SEC review, rendering any opportunity for later review at best inadequate and, at worst, moot. A business's "destruction in its current form" commonly qualifies as irreparable harm. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); *see In re NTE Conn., LLC*, 26 F.4th

980, 990 (D.C. Cir. 2022) ("[F]inancial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date[.]") (formatting modified); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Recoverable monetary loss may constitute irreparable harm" if "the loss threatens the very existence of the movant's business.").

Here, Alpine has shown that its expulsion from FINRA will effectively amount to exclusion from the securities industry, forcing it to shutter its operations immediately. *See* Decl. of Maranda E. Fritz ¶ 7, ECF 46 (May 9, 2023); *see also* Oral Arg. Tr. 58:5–8 (FINRA's counsel explaining that Alpine would violate the Exchange Act if it continued to trade securities after expulsion).

Neither FINRA nor the government disputes this reality or its crushing consequences for Alpine's business operations. To be sure, FINRA's counsel at oral argument assured that Alpine could "reinstate their business in the event that the SEC ultimately reverses FINRA's determination." Oral Arg. Tr. 57:18–20. That argument blinks reality. As FINRA's counsel conceded, full review by the SEC could take months, if not longer. Oral Arg. Tr. 57:24–25; *see, e.g.*, *Devin Lamarr Wicker*, 2024 WL 2188603, at *1 (affirming bar against an individual over two years after appeal was filed). It is not realistic to expect that Alpine, choked of any income or business from securities trading, could simply reopen its doors months, if not years, after FINRA locked them shut.

The magnitude of Alpine's injury also tips the balance of equities in favor of Alpine. FINRA unquestionably has an interest in enforcing its own rules. *See* 15 U.S.C. § 78*o*-3(b)(6) (self-regulatory organizations must "protect investors and the public interest"). FINRA argues that its interest may be

seriously impaired if the subjects of the "more than 1,000 pending FINRA investigations * * * [sought] injunctive relief in federal court." FINRA Br. 56. But our opinion is narrow and limited to expedited expulsion proceedings, where the irreversible nature of the underlying sanction prevents review on the merits by the SEC. As a result, the impairment to FINRA's operations is relatively limited, and is outweighed by the magnitude of Alpine's injury.

Finally, the public interest does not weigh against granting an injunction. An injunction ensures that Alpine's constitutional claims can be fully litigated, without being throttled by a shutdown of its business. Also, the injunction will not leave shareholders or the public unprotected from "continued victimization" by Alpine, FINRA Br. 56. As a threshold matter, whether Alpine actually committed the violations FINRA alleges is not before us, and we express no view on that issue.

In any event, as Alpine concedes, the SEC itself remains free to bring its own enforcement action against Alpine if it considers such action necessary to protect the public and to enforce securities laws. Alpine Opening Br. 51. The public also has notice of Alpine's prior violations through BrokerCheck, a publicly available service that Alpine links to from its own website. *See* ALPINE SECURITIES, https://perma.cc/PQ3C-HQG3; BrokerCheck Report: Alpine Securities Corporation at 16, BROKERCHECK (listing required public disclosures of prior regulatory incidents), https://perma.cc/7PE8-H7JF; *see also* FINRA Rule 2210(d)(8) (requiring member firms' websites to include a "readily apparent reference and hyperlink to BrokerCheck"). FINRA's ongoing, non-expedited proceeding against Alpine is also a matter of public record. *See* FINRA Rule 8313(a) (requiring

public release of disciplinary complaints and decisions upon request).

## C

For those reasons, we reverse the district court's denial of a preliminary injunction and instruct the district court, on remand, to enjoin FINRA during the pendency of this litigation from expelling Alpine (should such an order issue) until after the SEC has reviewed any expulsion order in FINRA's expedited proceeding or the time for Alpine to seek SEC review of an expulsion order has elapsed.

Our opinion today is limited in at least four ways. First, this case comes to us on a motion for a preliminary injunction. Our determination is, therefore, necessarily preliminary, as the only question is whether, on the limited record before us, Alpine has proven it is *likely* to succeed and to be irreparably harmed. *See Winter*, 555 U.S. at 20. Additional record development may or may not change Alpine's prospects. For example, record evidence may demonstrate that Alpine can stay in business long enough for the SEC to complete its review of FINRA's expedited expulsion order without injunctive relief, or that the SEC's stay authority functions in such a way that a stay is effectively automatic and immediately available.

Second, our opinion is limited to expulsion orders issued in expedited proceedings. In many cases, the lack of pre-enforcement government review is unlikely to violate the Constitution because review can take place after FINRA's sanctions take effect. That is because many types of sanctions imposed by FINRA, short of expulsion, can be undone later. Censures can be rescinded, fines can be returned, and cease-and-desist orders can be lifted. *See* FINRA Rule 8310(a) (listing potential sanctions); *cf. Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191–192 (2023) (Parties often must "wait before

appealing, even when doing so subjects them to significant burdens.") (quotation marks omitted). For that reason, Alpine has not demonstrated at this time that it is entitled to a preliminary injunction against any sanctions short of expulsion that FINRA may impose in the expedited proceeding.

Expulsion from FINRA, though, is unique because federal law requiring membership in a self-regulatory organization, 15 U.S.C. § 78*o*(b)(1), forces expelled FINRA members, without any governmental review of the merits, to shut down their securities-trading businesses—a harm that can have immediate and often financially devastating consequences that cannot be adequately remedied later. That is true at least for companies like Alpine that do not engage in any other significant business that could sustain their operations. *See* BrokerCheck Report: Alpine Securities Corporation, *supra*, at 10 ("This firm does not engage in other non-securities business.").[3]

Third, this opinion does not speak to either FINRA's own ability to delay the effectiveness of its expulsion orders in

---

[3] FINRA will also sometimes bar individuals from associating with a FINRA member. *See* FINRA Rule 8310(a)(5). Such a bar may be meaningfully different from expulsion of a FINRA member firm since a person barred from trading securities can pursue other work while appealing to the SEC, while a firm organized for the purpose of trading securities cannot.

We also note that membership in a registered securities association like FINRA is not mandatory for securities traders that only trade on one exchange. 15 U.S.C. § 78*o*(b)(1). Such firms can instead be members of the exchanges on which they trade. *Id.* Alpine does not trade exclusively on one exchange. We therefore express no view as to the constitutional implications of FINRA's expulsion of a firm that trades on only one exchange and chooses to be a member of both FINRA and that exchange.

expedited proceedings, or the SEC's authority to lower its stay standard in expulsion cases. We note, for example, that FINRA automatically stays the effectiveness of all sanctions other than a bar or expulsion issued following a non-expedited disciplinary proceeding. FINRA Rule 9370(a). The SEC also sometimes stays monetary penalties or short-term suspensions regardless of the likelihood of success on the merits. *See, e.g.*, *Allen Holeman*, Exchange Act Release No. 86769, 2019 WL 4044065, at *2 (S.E.C. Aug. 26, 2019); *Donald L. Koch*, Exchange Act Release No. 3860, 2014 WL 2800778, at *3 n.15 (S.E.C. June 20, 2014) ("While [the SEC has] customarily stayed suspensions less than a bar, granting a stay of a permanent bar pending Commission review [is] appropriate only in extraordinary circumstances.") (formatting modified).

Fourth, nothing in our opinion questions the constitutionality of enforcing an expulsion order, or any other sanction, after the SEC has affirmed it. Alpine has raised no such argument here and has not sought a preliminary injunction on that basis. So all we hold today is that it appears on this record that SEC review is not available as a practical matter in expedited expulsion proceedings prior to businesses being forced to close, and that gap likely runs afoul of the private nondelegation doctrine.

**V**

We turn next to Alpine's Appointments Clause claims. Alpine argues that FINRA's hearing officers are officers of the United States who must be appointed in conformance with the Appointments Clause and must be removable at will. Alpine Opening Br. 42–47. We hold that Alpine is not entitled to a preliminary injunction on these claims because it has not demonstrated that it will suffer irreparable harm from its

asserted Appointments Clause violations pending resolution of the district court case.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24; *see Benisek v. Lamone*, 585 U.S. 155, 158 (2018); *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022). To that end, parties seeking a preliminary injunction, among other things, must clear a "high standard" and demonstrate that their injury is "both certain and great[.]" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–298 (D.C. Cir. 2006) (quotation marks omitted). That is, parties must demonstrate that their injury is sufficiently serious that there is a "clear and present need for equitable relief" on an expedited timeline and without the benefit of full factual development and hurried consideration of legal questions. *Id.* (quotation marks omitted).

Alpine makes two arguments for irreparable harm arising from the alleged Appointments Clause violations. First, it claims that FINRA can force it to close. Alpine Opening Br. 48. Second, it claims that it is being subjected to an unconstitutional proceeding before an unconstitutional body. Alpine Opening Br. 48. On this early record, neither of those injuries necessitates preliminary injunctive relief as to Alpine's Appointments Clause claims.

**A**

We begin with the asserted harm of forced closure as a result of expulsion from FINRA. That harm is no longer pressing given that we have already held that FINRA cannot expel Alpine until after the SEC has reviewed such a decision and made its own determination as to whether Alpine can continue to trade securities. Under the limited preliminary injunction we have ordered, the SEC will have the final word. And what the SEC will independently decide, after

"conduct[ing] its own review," *Saad*, 873 F.3d at 300, about Alpine's ability to continue to trade securities is unknown. In fact, Alpine has previously "succeed[ed] * * * in having all the findings and sanctions of the FINRA Hearing Officer reversed by the SEC." Alpine Br. 48, *see Scottsdale Cap. Advisors Corp.*, Exchange Act Release No. 93052, 2021 WL 4242630, at *1 (S.E.C. Sept. 17, 2021) ("Upon our independent review of the record, * * * we have determined to set aside FINRA's findings of violations and the imposition of sanctions."). Without knowing how the SEC will rule and without any argument from Alpine about the likelihood that the SEC would uphold an expulsion order (should FINRA issue one), Alpine's expulsion after full SEC review is far too uncertain and unpredictable at this time to warrant the extraordinary relief of a preliminary injunction. *See Chaplaincy*, 454 F.3d at 298.

Even if the SEC ultimately were to affirm an expulsion order against Alpine, the significant consequences that come with expulsion from FINRA would be imposed by the SEC, not FINRA. Alpine, notably, does not dispute that the SEC's members are constitutionally appointed and have the authority to expel Alpine from the securities industry consistent with the Appointments Clause. To be sure, if FINRA's structure were ultimately held to violate the Appointments Clause, then arguably a new hearing before a properly appointed hearing officer might be necessary even if the SEC separately signed off on any expulsion order. *See Lucia*, 585 U.S. at 251 ("[T]he appropriate remedy for an adjudication tainted with an appointments violation is a new hearing before a properly appointed official.") (quotation marks omitted). But those questions are best considered after the SEC has rendered its decision in this case, not before, as Alpine raises no claim of irreparable harm from the SEC review process itself. We accordingly express no view on those questions.

**B**

**1**

Without the possibility of unilateral expulsion from the securities industry by FINRA, Alpine is left with its asserted injury of being forced to litigate before an allegedly unconstitutionally appointed FINRA officer. Invoking prior circuit precedent that holds that constitutional violations "constitute[] irreparable injury[,]" Alpine claims that the alleged violations of the Appointments Clause it identifies are "per se irreparable harm." Alpine Opening Br. 48 (quoting *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)).

Three of our prior cases foreclose that argument.

First, in *Deaver v. Seymour*, 822 F.2d 66 (D.C. Cir. 1987), Deaver sought a preliminary injunction against a criminal investigation led by an independent counsel, *id.* at 66. Deaver claimed that the independent counsel had been unconstitutionally appointed. *Id.* at 68. This court held that, even assuming that the independent counsel was a "a pretender to the throne," any Appointments Clause violation was not irreparable because it could be redressed "by a reversal of any conviction." *Id.* at 70–71; *see id.* at 72 (Ginsburg, J., concurring) ("It is of no moment that Deaver bases his challenge upon the alleged unconstitutionality of the office of independent counsel[.]"). The court further explained that to hold otherwise would circumvent the final judgment rule. *Id.* at 71. And it would force us to decide "serious" issues with "far-ranging and troubling constitutional implications" through "accelerated and unorthodox review"—constitutional questions that we would have no need to decide should Deaver be acquitted. *Id.* Because "[w]e have an obligation to avoid constitutional questions if at all possible[,]" we affirmed the district court's denial of a preliminary injunction. *Id.*; *see*

*Camreta v. Greene*, 563 U.S. 692, 705 (2011) ("A longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.") (quotation marks omitted); *Liverpool, N.Y. & Phila. S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39 (1885). As Chief Justice Rehnquist observed when denying a stay in *Deaver*, "[t]here [would] be time enough for [Deaver] to present his constitutional claim to the appellate courts if and when" Deaver were to be convicted in the underlying prosecution. *Deaver v. United States*, 483 U.S. 1301, 1303 (1987) (Rehnquist, C.J., in chambers).

Second, in *In re al-Nashiri*, 791 F.3d 71 (D.C. Cir. 2015), a Guantanamo Bay detainee sought mandamus relief against an ongoing military commission proceeding on the ground that the commission's judges were not appointed in conformance with the Appointments Clause, *id.* at 75. Of course, the standards for mandamus relief and preliminary injunctions differ in some respects. But what matters here is that they both require the movant to show irreparable injury. *Compare National Ass'n of Crim. Def. Lawyers, Inc. v. Department of Justice*, 182 F.3d 981, 986 (D.C. Cir. 1999) ("[T]o determine whether a 'supervisory' writ of mandamus shall issue," courts consider whether the party seeking the writ "will be harmed in a way not correctable on appeal[.]"), *with Changji Esquel Textile 1 Co. Ltd.*, 40 F.4th at 721 ("A plaintiff seeking a preliminary injunction 'must establish that * * * he is likely to suffer irreparable harm in the absence of preliminary relief[.]'") (quoting *Winter*, 555 U.S. at 20).

In that vein, *In re al-Nashiri* held that the detainee had not demonstrated irreparable harm because he had not identified any "immediate or ongoing harm stemming from the [military commission's] alleged constitutional defects." 791 F.3d at 80. For example, the commission had not yet convicted the

detainee, and the detainee had not alleged that the improperly appointed judges were biased against him. *Id.* at 79–80. Said another way, *In re al-Nashiri* holds that simply participating in a proceeding conducted by an allegedly unconstitutionally appointed officer is not itself irreparable harm that justifies extraordinary relief. *See id.*

Third, in *John Doe Co. v. Consumer Financial Protection Bureau*, 849 F.3d 1129 (D.C. Cir. 2017), a private company sought a preliminary injunction against an investigation by the Consumer Financial Protection Bureau, *id.* at 1131. The company claimed that (1) the Bureau was unconstitutionally structured; (2) the investigation against it violated the separation of powers; and (3) "any alleged separation-of-powers injury is by its very nature irreparable." *Id.* at 1133–1135. We rejected that third argument and held that, "[i]n the absence of 'immediate or ongoing harm stemming from the [Bureau's] alleged constitutional defects,' the 'violation of separation of powers' by itself is not invariably an irreparable injury." *Id.* at 1135 (second alteration in original) (quoting *In re al-Nashiri*, 791 F.3d at 79–80).

Taken together, those three cases squarely hold that being investigated by, or participating in a proceeding before, an unconstitutionally appointed officer is not, without more, an injury that necessitates preliminary injunctive relief. And Alpine has not asserted anything more. *See Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 754 (10th Cir. 2024) ("[A] separation of powers violation, alone, [does] not constitute irreparable harm[.]").

As a panel, we are bound by our precedent unless "intervening Supreme Court precedent * * * clearly dictate[s] a departure[.]" *Bahlul v. United States*, 77 F.4th 918, 926 (D.C. Cir. 2023) (quoting *Old Dominion Elec. Coop. v. FERC*, 892

F.3d 1223, 1232 n.2 (D.C. Cir. 2018)); *see also LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc). To do so, intervening Supreme Court authority must "effectively overrule, *i.e.*, eviscerate, the law of our circuit." *Bahlul*, 77 F.4th at 925 (formatting modified).

Alpine, however, makes no argument at all that our precedent has been effectively overruled or that there is any other basis on which this panel could depart from it. In fact, Alpine ignores all three of those cases.

**2**

The dissenting opinion makes arguments on Alpine's behalf that it has forfeited. But to no avail. For example, the dissenting opinion claims that our decision in *Deaver* depended critically on "the Federal Rules of Criminal Procedure, criminal-law precedents, equity's interaction with criminal proceedings, and the collateral-order exception to the final-judgment rule[,]" none of which this case involves. Dissenting Op. at 25. To be sure, the court in *Deaver* mentioned those factors. 822 F.2d at 70–71. But its ultimate ruling did not *depend* on them. Instead, the ruling—like Chief Justice Rehnquist's own decision—hinged on the availability of full relief on later review. *Id.* at 71; *see Deaver*, 483 U.S. at 1303 (Rehnquist, C.J., in chambers) ("There will be time enough for applicant to present his constitutional claim to the appellate courts if and when he is convicted of the charges against him."). That has to be right. Court-made rules and precedent necessarily would have to take a back seat if just going forward with the case inflicted a constitutional injury.

The dissenting opinion equally errs in arguing that *In re al-Nashiri* confined its holding to the context of military commissions. *See* Dissenting Op. at 25–26. Considerations about insulating the military from legislative or judicial

interference appear nowhere at all—not one word—in *al-Nashiri*'s analysis of irreparable harm. *See* 791 F.3d at 79–81. This court's historic practice of faithful panel adherence to circuit precedent cannot be circumvented by pretending a prior decision said something it plainly did not.

Finally, the dissenting opinion's effort to unravel the precedential status of *John Doe* fails. This court has treated that published decision as binding precedent for seven years. *See, e.g.*, *Archdiocese of Wash. v. Washington Metro. Area Transit Auth.*, 877 F.3d 1066, 1066 (D.C. Cir. 2017); *CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 688 (D.C. Cir. 2017). A later panel is not free to sweep away that history. Especially based on an argument that no party has advanced.

## C

Turning to the arguments that Alpine raises to support its preliminary injunction motion, Alpine anchors its irreparable harm argument in *Axon Enterprises v. Federal Trade Commission*, 598 U.S. 175 (2023), arguing that it automatically mandates a finding of irreparable harm here. That is incorrect.

In *Axon*, the question before the Supreme Court was whether parties to an ongoing proceeding before a governmental agency had to first go through the agency's administrative process before suing in federal court to challenge the administrative proceeding's structural constitutionality. 598 U.S. at 180. The Supreme Court concluded that they do not because, in enacting the relevant statutory review schemes, 15 U.S.C. §§ 45(c), 78y, "Congress [did] not intend to limit [court] jurisdiction" when constitutional challenges are made to the agency process itself. *Axon*, 598 U.S. at 186. The Supreme Court reasoned that an alleged Appointments Clause violation is "a here-and-now

injury" that "is impossible to remedy once the [administrative] proceeding is over," *id.* at 191 (quotation marks omitted), and so an aggrieved party could file that constitutional challenge directly in federal court.

Seizing on that language, Alpine claims that *Axon* held that being forced to participate in an unconstitutional agency proceeding necessarily qualifies as irreparable harm supporting the issuance of a preliminary injunction. That overreads *Axon* in two respects.

First, *Axon* answered a statutory jurisdictional question about whether Congress intended to "oust[] district courts of jurisdiction" they would ordinarily have by requiring that parties instead litigate their claims through agency proceedings. *Axon*, 598 U.S. at 185–186. The Court's answer to *Axon*'s question turned in significant part on the common-sense intuition that a structural constitutional question was both "wholly collateral to" the questions at issue in agency proceedings and lies "outside the agency's expertise." *Id.* at 186.

In finding Axon's claims within the district court's ordinary jurisdiction, the Court did not speak to what constitutes irreparable harm for purposes of the extraordinary remedy of a preliminary injunction. True, the Court also reasoned that the injury it identified could not be remedied if a party were forced to litigate before the agency prior to raising its claims in federal court. *Axon*, 598 U.S. at 192. But here, there is no barrier to Alpine litigating its constitutional claims directly in federal court. That is exactly what it has done. Instead, the question before us, which was not answered in *Axon*, is whether the injury Alpine claims is so great that it necessitates "accelerated and unorthodox" summary review of the merits without a developed factual record. *Deaver*, 822

F.2d at 71; *see Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (2024) (Thomas, J., statement respecting the denial of certiorari) ("This Court is rightly wary of taking cases in an interlocutory posture."); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1015 (10th Cir. 2004) (en banc) (McConnell, J., concurring) ("[M]any preliminary injunctions must be granted hurriedly and on the basis of very limited evidence," forcing courts "to make a choice under conditions of grave uncertainty.").

Put another way, *Axon* at most says that, as a matter of statutory jurisdiction, a federal-court challenge to an unconstitutional appointment can begin before the agency acts. It does not say that every agency proceeding already underway must immediately be halted because of an asserted constitutional flaw. So while Alpine's interpretation of *Axon* is "arguable," *Axon* does not "clearly dictate a departure from circuit law." *Bahlul*, 77 F.4th at 926 (quotation marks omitted). Importantly, Alpine does not argue otherwise.

Second, as Alpine's *private* nondelegation argument suggests, FINRA is not a government agency like those at issue in *Axon*. FINRA is a Delaware nonprofit corporation, and its personnel are private employees, not government employees. Regardless of whether FINRA is ultimately found to be wearing a government hat when it expels members, it is also formally a private, self-regulatory membership organization. Nothing in *Axon* addressed an asserted injury from a member of a private organization having to go through a hearing process before such an entity. Whether or not Alpine has a meritorious Appointments Clause objection to the FINRA process in its current form, *Axon* does not speak to the nature of any such injury clearly enough to "dictate a departure" by this panel from prior circuit precedent. *Bahlul*, 77 F.4th at 926 (quotation

marks omitted). And again, Alpine tellingly has not argued to the contrary.

In sum, we hold that Alpine has not demonstrated irreparable harm stemming from the alleged violations of the Appointments Clause other than the harm from expulsion that is already redressed by the nondelegation preliminary injunction. Because "[a] movant's failure to show any irreparable harm is * * * grounds for refusing to issue a preliminary injunction," we hold that Alpine is not entitled to a preliminary injunction based on its asserted Appointments Clause violations. *Chaplaincy*, 454 F.3d at 297; *see Winter*, 555 U.S. at 22 (Issuing a preliminary injunction without "demonstrat[ing] that irreparable injury is likely * * * is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). We accordingly express no view on the remaining preliminary-injunction factors, including whether Alpine has demonstrated a likelihood of success on the merits of the applicability of the Appointments Clause to FINRA's employees. All we hold is that Alpine has not shown, on this record, that any such violation would present irreparable harm to Alpine that necessitates the exceptional remedy of a preliminary injunction against the proceeding itself.

## VI

"'Long settled and established practice may have great weight' in interpreting constitutional provisions about the operation of government." *CFPB v. Community Fin. Servs. Ass'n of America*, 601 U.S. 416, 442 (2024) (Kagan, J., concurring) (quoting *Chiafalo v. Washington*, 591 U.S. 578, 592–593 (2020)). Self-regulation in the securities industry has existed for centuries, and Congress has repeatedly reaffirmed

its own nearly century-old commitment to this system. Given that history and the preliminary record in this case, we proceed carefully at this early stage of the litigation, where we lack the benefit of full factual development and the wisdom it affords.

Alpine has met its burden of demonstrating a likelihood that the private nondelegation doctrine requires that SEC review be available before Alpine can be expelled from FINRA because, under federal law, that decision would effectively ban Alpine from the securities trading industry. Alpine has also shown that it faces irreparable harm if expelled from the securities industry in that it will have to shut down its business immediately. For those reasons, the district court erred in denying Alpine a preliminary injunction protecting it against being expelled from FINRA (should FINRA issue such an order) until either the SEC affirms FINRA's decision or the time for Alpine to seek SEC review has elapsed.

As to Alpine's Appointments Clause claims, Alpine has not demonstrated that it faces irreparable harm stemming from participating in FINRA's hearing process enforcing FINRA's membership rules, since FINRA's decision can no longer pose the threat of wholesale exclusion from securities trading. For that reason, Alpine is not entitled to a preliminary injunction against FINRA's expedited proceeding itself, and FINRA may resume the expedited proceeding against Alpine.

Finally, we underscore that nothing in this opinion resolves Alpine's claims on the merits. We leave that for the district court to decide on remand.

For the foregoing reasons, we reverse the district court insofar as it held that FINRA could singlehandedly expel Alpine and thereby exclude it from the securities trading industry, and remand for the court to enter a limited preliminary injunction enjoining FINRA from giving effect to

any expulsion order issued against Alpine until either the SEC reviews the order on the merits or the time for Alpine to seek SEC review lapses. The injunction pending appeal entered by this court on July 5, 2023, is hereby dissolved only to the extent that it enjoins FINRA's expedited proceeding from going forward. The portion of the injunction that would preclude FINRA from giving effect to any expulsion order it might issue against Alpine will remain in effect until the district court issues its injunction.

*So ordered.*

WALKER, *Circuit Judge*, concurring in the judgment in part and dissenting in part:

Article II of the Constitution begins, "The executive Power shall be vested in a President of the United States of America." That means private citizens cannot wield significant executive authority. Nor can anyone in the government, except for the President and the executive officers appointed and removable consistent with Article II.

The Financial Industry Regulatory Authority is a nominally private corporation. It investigates, prosecutes, and adjudicates violations of federal securities laws. Those laws generally forbid broker-dealers from doing business unless they belong to FINRA.

Today, the majority holds that the Constitution likely requires government review before FINRA may expel a company from its ranks and thereby put that company out of business. That holding is a victory for the Constitution.

But it is only a partial victory because the problems with FINRA's enforcement proceedings run even deeper. FINRA wields significant executive authority when it investigates, prosecutes, and initially adjudicates allegations against a company required by law to put itself at FINRA's mercy. That type of executive power can be exercised only by the President (accountable to the nation) and his executive officers (accountable to him).

By flouting that principle through an "illegitimate proceeding, led by an illegitimate decisionmaker,"[1] FINRA imposes an irreparable injury that this court should prevent by granting the requested preliminary injunction in its entirety.

---

[1] *Axon Enterprise, Inc. v. FTC*, 143 S. Ct. 890, 903 (2023).

I respectfully dissent from the majority's decision to deny that relief.

## I

In response to the 1929 stock market crash and the onset of the Great Depression, Congress enacted a series of laws to regulate securities trading.[2]  The Securities Exchange Act of 1934 introduced registration, disclosure, and reporting requirements designed to restore confidence in the U.S. stock market.[3]  The Act also created the Securities and Exchange Commission to enforce the nation's securities laws.

A few years later, the Maloney Act addressed trading activity outside the major exchanges.[4]  It encouraged broker-dealers to organize securities associations and register them as self-regulatory bodies.[5]

---

[2] *See SEC v. Jarkesy*, 144 S. Ct. 2117, 2125 (2024).

[3] Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (1934) (codified at 15 U.S.C. § 78a, *et seq*.).

[4] *See* Maloney Act of 1938, ch. 677, sec. 1, § 15A(b)(3), 52 Stat. 1070, 1070 (1938) (codified at 15 U.S.C. § 78o-3(b)(11)).

[5] *See id.* sec. 1, § 15A(a), 52 Stat. at 1070; *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 700 n.6 (1975) ("The Maloney Act supplements the Securities and Exchange Commission's regulation of the over-the-counter markets by providing a system of cooperative self-regulation through voluntary associations of brokers and dealers.").

The Maloney Act was not the government's first attempt to regulate over-the-counter activity.  President Roosevelt approved in 1934 an applicable "code of fair competition" under the National Industrial Recovery Act.  Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All, in* Building Responsive and Responsible Financial Regulators in the Aftermath

For several decades, membership in securities associations was voluntary.[6] But in 1983, Congress changed course and made membership mandatory for nearly all brokers and dealers.[7] And today, the only securities association recognized by the SEC is FINRA.[8] That means, in effect, membership in FINRA is mandatory for anyone who wants to run a brokerage.

---

of the Global Financial Crisis 234 (Pablo Iglesias-Rodríguez ed., 2015). But this was short-lived, as the Supreme Court ruled in 1935 that the Act was unconstitutional. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541-42 (1935).

[6] *Over-the-Counter Trading and the Maloney Act*, 48 Yale L.J. 633, 646 (1939).

While federal law did not mandate membership, over-the-counter stockbrokers were faced with "two choices, either to join a registered association and get some voice as to what rules shall govern them, or stay out and be regulated by the Commission." *Id.* As an additional incentive, the Act provided members with a limited exemption from the antitrust laws that permitted members to offer discounts exclusively to members. Maloney Act, sec. 1, § 15A(i)(3), (n), 52 Stat. at 1074-75.

[7] An Act To Make Certain Amendments to Sections 4, 13, 14, 15, and 15B of the Securities Exchange Act of 1934, sec. 3, § 15(b)(8), 97 Stat. 205, 206-07 (1983) ("It shall be unlawful for any broker or dealer required to register pursuant to this title to effect any transaction in . . . any security . . . unless such broker or dealer is a member of a securities association . . . .") (codified as amended at 15 U.S.C. § 78o(a)(1), (b)(1)).

[8] *See Exemption for Certain Exchange Members*, 88 Fed. Reg. 61,850, 61,851 (Sept. 7, 2023) (noting FINRA is "the only" registered national securities association).

FINRA is the product of a 2007 merger between the National Association of Securities Dealers and the New York Stock Exchange's enforcement arm. *Order Approving Proposed Rule Change to Amend the By-Laws of NASD*, 72 Fed. Reg. 42,169, 42,169-70 (Aug. 1, 2007).

FINRA is led by a Board of Governors,[9] comprised of "industry" and "public" representatives, who are either elected by FINRA's members or appointed by the Board itself.[10] The Board selects a chief executive officer, who directly supervises the Office of Hearing Officers.[11] The hearing officers preside over enforcement proceedings.[12]

Though FINRA describes itself as "a private corporation that the government did not create and does not control," it functions in ways similar to a government agency.[13] Federal

---

The federal statute that requires all brokerages to maintain membership in a securities association does have what might be read as an exception — 15 U.S.C. § 78o(b)(9) authorizes the SEC to "conditionally or unconditionally exempt from [the requirement to join a securities association] any broker or dealer." However, it appears that this provision has been used only to create formal rules carving out broad, categorical exemptions for groups of broker-dealers whose activities fall somewhat outside the gambit of the industries FINRA is expected to regulate. *See* 17 C.F.R. §§ 240.15b9-1, 240.15b9-2; *U.S. Securities Corp.*, SEC Staff No-Action Letter, 1995 SEC No-Act. LEXIS 470, at *3 (Feb. 1, 1995).

[9] *See* By-Laws of the Corporation, FINRA, art. VII, § 1, https://perma.cc/8FUG-PPKZ.

[10] *See id.* art. I, §§ (n), (r), (t), (w), (z), (dd), (tt), (xx) (defining each type of representative); *id.* art. VII, § 4(a) (Composition and Qualifications of the Board); *id.* art. VII, § 5 (Term of Office of Governors).

[11] *See id.* art. VIII, § 1; *Office of Hearing Officers*, FINRA, https://perma.cc/VM5D-7RP2 ("OHO reports directly to FINRA's Chief Executive Officer.").

[12] *See Office of Hearing Officers*, FINRA ("Hearing Officers . . . preside over disciplinary and expedited actions commenced by FINRA's Enforcement Department . . . .").

[13] FINRA Br. at 2.

law grants FINRA the power to promulgate rules that carry "the force of law" upon SEC approval.[14] In addition to that quasi-legislative power, FINRA acts in "an adjudicatory and prosecutorial capacity" and "is required by statute to enforce the securities laws."[15]

In particular, FINRA is responsible for "enforc[ing] compliance" with the Securities Exchange Act and any "rules and regulations thereunder."[16] Much like the SEC, FINRA has its own "Department of Enforcement," which can initiate investigations and prosecutions when it suspects a violation of "any rule, regulation, or statutory provision, including the federal securities laws and the regulations thereunder."[17]

The Department of Enforcement conducts invasive investigations. It can require brokers to "provide information

---

[14] *See McDaniel v. Wells Fargo Investments, LLC*, 717 F.3d 668, 673 (9th Cir. 2013).

FINRA itself has claimed — in other contexts where the constitutionality of its structure has not been challenged — that "FINRA rules have the force and effect of a federal regulation." *In re Charles Schwab & Co.*, 2014 WL 1665738, at *16 (FINRA Apr. 24, 2014).

[15] *See Austin Municipal Securities, Inc. v. National Association of Securities Dealers, Inc.*, 757 F.2d 676, 692 (5th Cir. 1985).

[16] 15 U.S.C. § 78s(g)(1); *see also National Association of Securities Dealers, Inc. v. SEC*, 431 F.3d 803, 804 (D.C. Cir. 2005) (noting that FINRA has "express statutory authority to adjudicate actions against members who are accused of illegal securities practices and to sanction members found to have violated the Exchange Act or Securities and Exchange Commission . . . regulations").

[17] FINRA Rule 9211(a)(1).

FINRA's rules, including past versions, can be accessed at https://www.finra.org/rules-guidance/rulebooks/finra-rules.

orally, in writing, or electronically."[18]   It also can force a broker's employees to "testify at a location specified by FINRA staff, under oath or affirmation."[19]

After that, FINRA may initiate a formal enforcement proceeding to fine members or expel them from FINRA.[20] Because FINRA membership is mandatory, expulsion from FINRA is, in effect, expulsion from the securities industry. From a broker's perspective, it's the "corporate death penalty."

These enforcement proceedings come in two forms.  In the ordinary proceeding, a member may appeal an unfavorable ruling first to an internal appellate tribunal and then to the SEC.[21]  But in an expedited proceeding, sometimes overseen by only one hearing officer, internal review of the decision is discretionary, and the hearing officer's decision to expel a member takes effect immediately, before the member can appeal to the SEC.[22]

This panoply of enforcement powers requires no contemporaneous oversight by the SEC.  The SEC does not control FINRA's investigations, its prosecutions, or its initial adjudications.  Until the SEC accepts an appeal from a final FINRA decision, FINRA wields its enforcement powers unilaterally.

---

[18] FINRA Rule 8210(a)(1).

[19] *Id.*

[20] FINRA Rules 8310(a), 9211(a).

[21] FINRA Rules 9311(a), 9349(a), 9370(a).

The FINRA Board may, at its discretion, choose to review a case heard by the internal appellate tribunal and affirm, modify, or reverse its decision.  FINRA Rule 9351(a), (d).

[22] FINRA Rule 9559(d), (q), (n), (r).

Today's case illustrates those powers in action. For almost six years, FINRA has been investigating and prosecuting Alpine Securities Corporation. Three years into that process, FINRA decided to expel Alpine from the securities industry, and it ordered Alpine to cease and desist its alleged misconduct.

While contesting that decision before FINRA's appellate tribunal, Alpine challenged FINRA's constitutionality in federal court. During that litigation, FINRA launched an expedited proceeding to immediately expel Alpine for allegedly violating the cease-and-desist order. Though Alpine could ask the SEC to review any final expulsion order, an emergency expulsion order is not automatically stayed during the SEC's review.[23]

So Alpine moved to preliminarily enjoin that emergency proceeding until the final resolution of its claims. When the district court denied that motion, Alpine appealed. A panel of this court determined that Alpine's arguments merited an injunction pending appeal.[24]

## II

We consider four factors when deciding whether Alpine should receive a preliminary injunction: Is Alpine likely to succeed on its claims? Will it likely suffer an irreparable injury

---

[23] FINRA Rule 9559(r).

[24] *See Alpine Securities Corp. v. FINRA*, 2023 WL 4703307, at \*1 (D.C. Cir. July 5, 2023); *see also id.* at \*4 (Walker, J., concurring) ("There is a serious argument that FINRA hearing officers exercise significant executive power. And it is undisputed that they do not act under the President. That may be a constitutional problem.").

without relief?  Who does the balance of equities favor?  And which side does the public interest support?[25]  The first two factors — likelihood of success and irreparable injury — "are the most critical" in this inquiry.[26]  We review a district court's weighing of factors for abuse of discretion and its legal conclusions de novo.[27]

## III

The merits of this case turn on two bedrock principles. First, the government must not delegate significant executive authority to private actors.  Second, public officers must not exercise significant executive authority unless they are removable by the President and properly appointed.[28]

Alpine has made a strong showing that FINRA, whether private or public, violates one of these principles.

---

[25] *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

[26] *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

[27] *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022).

[28] The majority criticizes this formulation, claiming it "melds the private nondelegation doctrine with Alpine's Appointments Clause arguments."  Majority Op. at 24.  But the private nondelegation doctrine and Appointments Clause can be viewed as two sides of the same coin, even though they have developed on separate doctrinal tracks.  *See United States ex rel. Zafirov v. Florida Medical Associates, LLC*, No. 8:19-CV-01236-KKM-SPF, 2024 WL 4349242, slip op. at 49 n.8 (M.D. Fla. Sept. 30, 2024) ("The Supreme Court has, at times, articulated the 'significant authority' element of its test for officer status as a negative restraint on delegated executive power.").

9

**A**

Article II of the Constitution vests the "executive Power" with the President.[29] This vesting clause is "essentially a grant of the power to execute the laws."[30] Article II further provides that the President "shall take Care that the Laws be faithfully executed."[31] Thus, any "enforcement of federal law" necessarily implicates the executive power,[32] because the authority "to enforce [federal laws] or appoint the agents charged with the duty of such enforcement" are "executive functions."[33]

It "would be impossible for one man to perform" all enforcement actions himself.[34] So the Constitution "assumes" that the President will appoint "lesser executive officers" to assist in "discharging the duties of his trust."[35] Depending on the circumstances, these officers can investigate citizens, search their homes, arrest them, question them, issue regulatory orders, and carry out judicially approved penalties ranging from fines to imprisonment.[36]

---

[29] U.S. Const. art. II, § 1; *Seila Law, LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020) (recognizing that the executive power "belongs to the President alone").

[30] *Myers v. United States*, 272 U.S. 52, 117 (1926).

[31] U.S. Const. art. II, § 3.

[32] *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).

[33] *Springer v. Government of the Philippine Islands*, 277 U.S. 189, 202 (1928).

[34] *Seila Law*, 140 S. Ct. at 2197 (cleaned up).

[35] *Id.*

[36] *See National Horsemen's Benevolent & Protective Association v. Black*, 107 F.4th 415, 428 & nn.9-10 (5th Cir. 2024) (listing "quintessentially executive functions" and citing authorities).

While any government employee who enforces federal law exercises some amount of Executive Power, anyone who continuously and permanently "exercis[es] *significant authority* pursuant to the laws of the United States is an 'Officer of the United States.'"[37] An "Officer" must be properly appointed (as prescribed by Article II's Appointments Clause) and properly removable by the President (as implied by Article II's Vesting Clause).[38] Those requirements increase the officer's accountability to the President, who is accountable to the people, whose liberty is at stake.

Because these constitutional safeguards have been thought to apply only to the government, not private actors,[39] "core

---

[37] *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (emphasis added).

[38] U.S. Const. art. II, § 2, cl. 2 (Appointments Clause); *id.* art. II, § 1, cl. 1 (Vesting Clause); *see also Seila Law*, 140 S. Ct. at 2197; *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018).

[39] *See, e.g.*, *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 542 (1987) (stating that in analyzing whether the U.S. Olympic Committee violated the First Amendment, the "fundamental inquiry is whether [it] is a governmental actor to whom the prohibitions of the Constitution apply"); *National Horsemen*, 107 F.4th at 436-37 ("Challenges based on private nondelegation, on the one hand, and the Appointments Clause, on the other, appear mutually exclusive."); *cf.* Alexander Volokh, *The Myth of the Federal Private Nondelegation Doctrine*, 99 Notre Dame L. Rev. 203, 248 (2023) ("This strict separation-of-powers view opposes delegations to private parties because they're not part of the government. But presumably, if those private parties went through presidential nomination and Senate confirmation, the problem would be cured, because that appointment would have made them part of the federal government (most likely part of the executive branch). Perhaps a proponent of that view would say that this 'private' party had thereby become 'public.' And

governmental power must be exercised by the Department on which it is conferred and must not be delegated to others in a manner that frustrates the constitutional design."[40] So just as Congress cannot delegate its legislative power to the President, the President's executive power cannot be delegated away from the Executive Branch.[41]

Even worse than an interbranch delegation is an extrabranch delegation — the "most obnoxious form" of delegation.[42] If the vast powers of the federal government could be exercised *outside* the constitutional system, the government would be "able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form."[43]

---

my view is essentially the same: any private party can validly wield federal governmental power, provided they are properly appointed. I don't particularly care whether we label them 'public' or 'private,' because I don't think this labeling should matter much.").

[40] *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004).

[41] *See Schechter Poultry*, 295 U.S. at 535-39; *Pittston*, 368 F.3d at 394.

[42] *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *cf. Schechter Poultry*, 295 U.S. at 537 ("But would it be seriously contended that Congress could delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade or industries? . . . The answer is obvious. Such a delegation of legislative power is unknown to our law and is utterly inconsistent with the constitutional prerogatives and duties of Congress.").

[43] *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 397 (1995).

To be sure, private actors can sometimes play a small role in enforcing the law when they are closely controlled.[44] But private actors may not exercise so much power that they function as the government itself.[45] The government "may employ private entities for *ministerial* or *advisory* roles, but it may not give these entities governmental power over others," at least not when the private office is "continuing and permanent."[46]

**B**

FINRA is likely a private entity exercising significant executive authority. If so, FINRA subverts the constitutional design.

---

[44] *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940) (private entities must always "function subordinately" to the agency and under that agency's "authority and surveillance"); *Association of American Railroads v. U.S. Department of Transportation* ("*Amtrak I*"), 721 F.3d 666, 671 (D.C. Cir. 2013) (private entities may "help a government agency make its regulatory decisions"), *vacated and remanded on other grounds sub nom. Department of Transportation v. Association of American Railroads*, 575 U.S. 43 (2015) ("*Amtrak II*").

[45] *United States v. Ackerman*, 831 F.3d 1292, 1296 (10th Cir. 2016) ("when an actor is endowed with law enforcement powers beyond those enjoyed by private citizens, courts have traditionally found the exercise of the public police power engaged").

[46] First quoting *Pittston,* 368 F.3d at 395; then quoting *Lucia*, 138 S. Ct. at 2051 (quoting *United States v. Germaine*, 99 U.S. 508, 511-12 (1879)).

**1**

FINRA is a Delaware corporation, but it wields the significant executive authority that the Constitution vests in the Executive Branch alone.

Start by considering some of the actions FINRA may take, all without government oversight:

- Open an investigation;[47]

- Demand to inspect books, records, or accounts;[48]

- Require a brokerage employee to provide information orally, in writing, or electronically;[49]

- Require an employee to testify under oath;[50]

- Exercise prosecutorial discretion to choose formal disciplinary action instead of informal disciplinary action or to choose no action at all;[51]

---

[47] Jessica Hopper, *Working on the Front Lines of Investor Protection – How an Enforcement Action Becomes an Enforcement Action*, FINRA (June 4, 2020), https://perma.cc/N8ZB-8VCG ("FINRA investigations are opened from various sources, including examination findings, automated surveillance reports, filings made with FINRA, customer complaints, tips, and referrals from other regulators and FINRA departments.").

[48] FINRA Rule 8210(a)(2).

[49] FINRA Rule 8210(a)(1).

[50] *Id.*

[51] *See* FINRA Rule 9211(a); *Schellenbach v. SEC*, 989 F.2d 907, 912 (7th Cir. 1993) ("[FINRA] disciplinary proceedings are treated as an exercise of prosecutorial discretion."); *Wedbush Securities, Inc.*, Exchange Act Release No. 78568, 2016 WL 4258143, at *16 (Aug. 12, 2016) ("FINRA has broad prosecutorial discretion in deciding

- Authorize complaints against member broker-dealers;[52]

- Demand submission of trading data;[53]

- Negotiate settlements;[54]

- Require members to participate in live adjudicatory proceedings before an in-house tribunal;[55]

- Release, at its discretion, information related to disciplinary proceedings;[56]

- Impose the costs of the disciplinary proceeding on the disciplined member as FINRA "deems fair and appropriate";[57]

- Issue large fines;[58] and

- Expel a firm from FINRA and (in effect) from the securities industry, for violation of federal securities

---

against whom charges should be brought and what those charges should be."); Hopper, *Working on the Front Lines*; *Enforcement*, FINRA, https://perma.cc/G7RV-7J9N ("If it appears that rules have been violated, Enforcement will determine whether the conduct merits formal disciplinary action.").

[52] FINRA Rule 9211(b).

[53] FINRA Rules 8211, 8213.

[54] FINRA Rule 9270.

[55] FINRA Rules 9221(b), 9231, 9235.

[56] FINRA Rule 8313.

[57] FINRA Rule 8330.

[58] *See, e.g.*, News Release, FINRA, *FINRA Orders Record Financial Penalties Against Robinhood Financial LLC* (June 30, 2021), https://perma.cc/2KC4-EJZS (FINRA "fined Robinhood Financial LLC $57 million and ordered the firm to pay approximately $12.6 million in restitution, plus interest").

laws, federal regulations, or FINRA rules, or for failure to "promptly" pay a fine, sanction, or cost.[59]

Put simply, for brokers required (by statute) to join a securities association, FINRA operates as the "principal decisionmaker in the use of federal power."[60] That's because it enforces federal law and rules that carry the force of law.[61] And it does so without any initial approval from its supposed supervisor, the SEC. This "especially provocative exercise of governmental power by a private organization" transgresses the private nondelegation doctrine.[62]

---

[59] FINRA Rule 8320(c); *see also* FINRA Rule 8310(a).

[60] *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023).

[61] In this context, the relevant actions include both traditional enforcement tools and the quasi-judicial functions that the Supreme Court has said that an executive branch agency may perform without exercising the judicial power. *Adkins*, 310 U.S. at 400. The Constitution, of course, does not tolerate delegations of judicial power any more than it does delegations of executive or legislative power. *Buckley*, 424 U.S. at 121 (1976) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)) ("in the actual administration of the government Congress or the Legislature should exercise the legislative power, the President or the State executive, the Governor, the executive power, and the Courts or the judiciary the judicial power").

[62] 1 Kenneth Culp Davis, Administrative Law Treatise 141 (1st ed. 1958)).

Unlike a congressional delegation of legislative power to the executive branch, a delegation of executive power to a private entity cannot be saved by an "intelligible principle." *See Amtrak I*, 721 F.3d at 671 ("Even an intelligible principle cannot rescue a statute empowering private parties to wield regulatory authority.").

16

**2**

FINRA attempts to avoid this conclusion by suggesting that any private nondelegation problem posed by FINRA's enforcement powers are solved by SEC review because, at the very end of the process, the SEC can reverse a sanction that FINRA imposes. But reversal of the sanction does not negate the vast array of powers that FINRA exercises *before* the matter even reaches the SEC.

Moreover, FINRA's insistence that SEC review cures its constitutional defect is impossible to reconcile with *Lucia v. SEC*. The Supreme Court held in *Lucia* that the SEC's administrative law judges are "Officers of the United States" who must be properly appointed and removable, regardless of the SEC's ability to review their decisions.[63] There is no reason to think that nearly identical hearing officers who are private, rather than governmental, can enjoy the same degree of authority without (at least) the same restrictions. That would mean that the Constitution requires less accountability when significant executive authority is delegated *outside* the executive branch than when such authority is delegated *within* it.

Even putting *Lucia* aside, consider FINRA's power to initiate an enforcement action that may expel a company from the securities industry with the force of law. The problem? That's the power to decide "whether to take enforcement actions against violators of federal law,"[64] and it is among "the greatest unilateral powers a *President* possesses under the

---

[63] *See Lucia*, 138 S. Ct. at 2049-56.

[64] *United States v. Texas*, 143 S. Ct. 1964, 1975 (2023).

Constitution."[65] Only the President can decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law."[66] FINRA, however, would have us simply ignore that "aspect of the executive power."[67]

Also consider FINRA's power to settle an enforcement action. Suppose, for example, that FINRA has been investigating a company for about six years.[68] Of course, the investigation and enforcement proceedings have cost the company significant time and resources. But finally, after six years, FINRA and the company negotiate a deal: The company can stay in business — for the price of a fine and a waiver of its right to SEC review.

That settlement would "constitute final disciplinary action of FINRA."[69] But look at what's missing. At *no time* was the

---

[65] *In re Aiken County*, 725 F.3d 255, 264 (D.C. Cir. 2013) (emphasis removed and added); *see also id.* at 266 ("Prosecutorial discretion encompasses the Executive's power to decide whether to initiate charges for legal wrongdoing and to seek punishment, penalties, or sanctions against individuals or entities who violate federal law.").

[66] *Texas*, 143 S. Ct. at 1971 (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021)); *see also Buckley*, 424 U.S. at 138 ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 3)); *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case").

[67] *Texas*, 143 S. Ct. at 1975.

[68] Six years is about the amount of time FINRA has been pursuing Alpine, which by way of reference is also about the amount of time Kenneth Starr investigated Bill Clinton *added to* the time Robert Mueller investigated Donald Trump.

[69] FINRA Rule 9270(g).

SEC involved.[70] Nor was *any* executive officer with a commission from the President — just a Delaware corporation enforcing federal law.[71]

That illustrates a constitutionally significant difference between rulemaking and enforcement. Rulemaking can sometimes be properly supervised by final-stage review if the review occurs *before* the rule takes effect.[72] In contrast, enforcement actions cannot be properly supervised by final-stage review because severe restrictions on liberty can occur at every step.[73] So, for an enforcement action, the issue of *when* oversight occurs is just as important as *how much* oversight occurs.

## C

It is no solution to say FINRA is a "part of the Government."[74] Classifying FINRA as a public agency might

---

[70] *See* 17 C.F.R. § 201.420(a) (authorizing petition for SEC review only after final FINRA determination); *id.* § 201.401(d) (granting SEC discretion to stay final FINRA determinations but not pending FINRA proceedings); *cf. National Horsemen*, 107 F.4th at 430 (a private entity was not "subordinate to the agency" because, among other things, its penalties were "not automatically stayed pending appeal" to the agency).

[71] *See National Horsemen*, 107 F.4th at 430 (describing a similar "settlement scenario").

[72] *Id.* at 423-26.

[73] *Id.* at 430-31. *But see id.* at 433-35 & n. 20 ("express[ing] no opinion on whether the SEC-FINRA relationship poses any constitutional issues under the private nondelegation doctrine" but distinguishing FINRA from the private regulatory body at issue in that case).

[74] *Amtrak II*, 135 S. Ct. at 1253.

solve its private nondelegation problem, but it runs headlong into the rest of the Constitution.

To start, FINRA probably is *not* part of the government. It was not created by the government. It is not controlled by the government. It is not funded by the government. All these facts point in the same direction: FINRA is a private entity.[75]

But even if we assume FINRA is a governmental entity, Article II problems immediately arise because FINRA's hearing officers are indistinguishable from the administrative law judges in *Lucia* and the special trial judges in *Freytag*.[76] As such, hearing officers must be (1) properly appointed and (2) removable by the President — two conditions hearing officers cannot satisfy.

---

[75] *See* FINRA Br. at 2, 10 (FINRA is "a private corporation that the government did not create and does not control" and "funded by member fees and 'fines, penalties, and sanctions levied against its members'"); By-Laws of the Corporation, art. VI, § 1; *see also Kim v. FINRA*, 698 F. Supp. 3d 147, 163 (D.D.C. 2023) (denying preliminary injunction based on Article II claims in part "because FINRA is likely not a state actor").

[76] *See Lucia*, 138 S. Ct. at 2052-54; *Freytag v. Commissioner*, 501 U.S. 868, 880-82 (1991).

Indeed, FINRA's able counsel conceded that FINRA hearing officers exercise the same "significant authority" as the ALJs in *Lucia*. Oral Arg. Tr. at 66 ("I agree [hearing officers] exercise the same powers as SEC ALJs which in *Lucia* were found to exercise significant authority pursuant to the laws of the United States."); *see also id.* at 69 ("[I]n *Lucia*, the Supreme Court identified four powers that SEC ALJs exercised. Those four powers involved conducting hearings, hearing witnesses, enforcing discovery orders. Those four powers are also exercised by FINRA Hearing Officers.").

As in *Lucia* and *Freytag*, FINRA's hearing officers are permanent employees in continuing offices exercising "important functions" identified by the Supreme Court as markers of "significant authority."[77] Hearing officers "have authority to do all things necessary and appropriate to discharge [their] duties," which (as in *Lucia* and *Freytag*) includes taking testimony, conducting trials, ruling on the admissibility of evidence, and enforcing compliance with discovery orders.[78] And in performing these tasks, hearing officers exercise a wide degree of discretion — a hallmark of "significant authority."[79] In other words, as in *Lucia* and *Freytag*, FINRA's hearing officers possess "nearly all the tools of federal trial judges."[80]

The upshot is this: If FINRA is part of the government, then hearing officers are "Officers of the United States,"[81] and that means they must be appointed directly by the President, courts of law, or heads of departments — like the officials in *Lucia* and *Freytag*.[82] In addition, they can't be insulated from presidential removal by more than one level of for-cause removal restrictions.[83]

---

[77] *Freytag*, 501 U.S. at 881-82 (second part quoting *Buckley*, 424 U.S. at 126.).

[78] FINRA Rule 9235(a); *see also* FINRA Rule 9280; FINRA Rule 9260 et seq.

[79] *Freytag*, 501 U.S. at 882.

[80] *See Lucia*, 138 S. Ct. at 2053.

[81] Alpine also argued that members of FINRA's Board of Governors are "Officers of the United States." Alpine Br. at 46. I'll leave that issue for another day.

[82] *See Lucia*, 138 S. Ct. at 2049, 2052.

[83] *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 514 (2010).

FINRA's hearing officers violate both these principles. They are (presumably) appointed by FINRA,[84] not the SEC. And they have multiple layers of tenure protection. Specifically, hearing officers can be removed only by the FINRA CEO,[85] who in turn can be removed only for good cause by the SEC Commissioners,[86] who themselves are understood to be removable by the President only for good cause.[87]

\* \* \*

In short, Congress requires FINRA to "enforce" both its own rules and federal securities law, without adequate control

---

[84] The record does not reveal the precise mechanism by which hearing officers are appointed, but the corporate bylaws provide that FINRA Regulation, Inc., the subsidiary of FINRA that is responsible for enforcement functions, "may employ such agents and employees as the Board may deem necessary or advisable." By-Laws of FINRA Regulation, Inc., FINRA, art. 7, § 7.3, https://perma.cc/GS25-29PZ.

[85] *Office of Hearing Officers*, FINRA, https://perma.cc/VM5D-7RP2 ("[E]mployment protections exist for Hearing Officers to further ensure their independence. Only FINRA's Chief Executive Officer can terminate a Hearing Officer, and the termination can be appealed to the Audit Committee of FINRA's Board of Governors.").

[86] 15 U.S.C. § 78s(h)(4)(B).

[87] The Supreme Court has not expressly held that SEC commissioners are subject to tenure protection but decided *Free Enterprise Fund* "with that understanding." *See* 561 U.S. at 487 ("The parties agree that the Commissioners cannot themselves be removed by the President except under the *Humphrey's Executor* standard of 'inefficiency, neglect of duty, or malfeasance in office . . . .'"); *see also Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022) ("SEC Commissioners may only be removed by the President for good cause.").

by the President.[88]   That arrangement violates the Constitution.
Alpine has therefore demonstrated a strong likelihood of
success on the merits.

**IV**

Alpine has also shown that the denial of a preliminary
injunction will likely cause irreparable harm.

Irreparable harm has two components.  The asserted injury
must be certain and imminent.[89]  And it must be something that
can't later be fixed by "adequate compensat[ion] or other
corrective relief."[90]

The Supreme Court's recent decision in *Axon Enterprise,
Inc. v. FTC* tells us that Alpine faces certain and imminent harm
that cannot later be fixed.[91]  There, as here, the regulated party
challenged the constitutionality of an enforcement action
because the decisionmakers were "insufficiently accountable
to the President."[92]  There, as here, the regulated party objected
to the "harm" of "being subjected" to an "unconstitutional . . .

---

[88] 15 U.S.C. § 78o-3(b)(2) (one of many requirements for FINRA to
be recognized as a registered securities association).

[89] *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290,
297 (D.C. Cir. 2006).

[90] *Id.* at 297-98 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669,
674 (D.C. Cir. 1985)).

[91] 143 S. Ct. 890, 903-04 (2023).

[92] *Id.* at 897 ("Both respondents claim that the agencies'
administrative law judges (ALJs) are insufficiently accountable to
the President, in violation of separation-of-powers principles.").

proceeding by an unaccountable" decisionmaker.[93] And there, as here, being subjected "to an illegitimate proceeding, led by an illegitimate decisionmaker" was "a here-and-now injury" that "*is impossible to remedy once the proceeding is over*" because a "proceeding that has already happened cannot be undone."[94]

To be sure, *Axon* was answering a question about whether a district court had jurisdiction, not whether a court should grant a preliminary injunction.[95] But I struggle to see how an injury that is completely "impossible to remedy" (the standard there) meaningfully differs from an injury that is "beyond remediation" (the standard here).[96] When likely to succeed in a challenge to enforcement proceedings based on the Appointments Clause or the President's removal power, a party has the "right[] not to undergo the complained-of agency proceedings," which according to *Axon* are "impossible to remedy once the proceeding is over."[97] Nothing about *Axon*'s reasoning limits that fundamental legal principle to a defendant's motion to dismiss for lack of jurisdiction or excludes it from applying to a plaintiff's motion for a preliminary injunction.

None of this means that "every agency proceeding already underway must immediately be halted because of an asserted

---

[93] *Id.* at 903 (quoting Brief for Petitioner at 36, *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023) (No. 21-86), 2022 WL 1502571, at *36).

[94] *Id.* at 903-04 (emphasis added) (second part quoting *Seila Law*, 140 S. Ct. at 2196).

[95] Majority Op. at 37.

[96] First quoting *Axon*, 143 S. Ct. at 903; then quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

[97] *Axon*, 143 S. Ct. at 903-04.

constitutional flaw."[98] The movant must show, among other things, a likelihood of success on the merits. So assuming that most administrative agencies are structured in a way that complies with the Constitution, there will be no wave of preliminary injunctions.[99]

The majority cites a handful of our circuit's cases for the proposition that a separation-of-powers violation alone is not enough for irreparable harm: *Deaver v. Seymour*; *In re al-Nashiri*; and *John Doe v. CFPB*.[100] But none of these cases supplies a rule that controls this case.[101]

*First* — in *Deaver v. Seymour*, former presidential aide Michael Deaver asked the court to enjoin an independent counsel from indicting him. He argued that the independent counsel's appointment was unconstitutional.[102] This court declined to enjoin the indictment.[103] It reasoned in part that Deaver could "move to dismiss the charges under Federal Rule of Criminal Procedure 12(b)(1) for 'defects in the institution of the prosecution.'"[104]

---

[98] Majority Op. at 38.

[99] And even if there were a wave, the "fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *Free Enterprise Fund*, 561 U.S. at 499 (quoting *Bowsher v. Synar*, 478 U.S. 714, 736 (1986)).

[100] Majority Op. at 32-35.

[101] Alpine had no need to address *Deaver*, *al-Nashiri*, or *John Doe* — FINRA did not rely on them, and they do not control this case. *But see* Majority Op. at 35.

[102] 822 F.2d 66, 66-67 (D.C. Cir. 1987).

[103] *Id.* at 66-67.

[104] *See id.* at 68, 70.

*Deaver* is not on point. It depended on the Federal Rules of Criminal Procedure, criminal-law precedents, equity's interaction with criminal proceedings, and the collateral-order exception to the final-judgment rule. Today's case involves none of those topics.[105]

Absent *Axon*, perhaps *Deaver* would provide some guidance. But *Axon* stands for the very proposition that the majority says *Deaver* rejects. And if forced to choose between the two, I'll take *Axon* — a Supreme Court case from last year that involved a civil enforcement proceeding like today's case — over a circuit case from 37 years ago that involved a criminal prosecution unlike today's case.

*Second* — in *al-Nashiri*, a detainee at Guantanamo Bay sought mandamus relief from a military commission proceeding.[106] Even at first blush, the differences in the cases are apparent. Mandamus relief and preliminary injunctions have different standards because they serve distinct functions.[107] And the military's critical role requires insulation

---

[105] Despite its differences with today's case, *Deaver* ended up promising something like what Alpine is seeking — the opportunity to obtain relief from a district court (there, a 12(b)(1) dismissal; here, a preliminary injunction) *before* being subjected to proceedings involving someone unconstitutionally appointed (there, a prosecutor; here, a hearing officer). *Id.* at 68-70. To be sure, in a line of dicta, the court speculated that it would not consider a future *appeal* if the district court denied Deaver's 12(b)(1) motion. *Id.* at 70-71. But today's challenge to a civil enforcement proceeding does not turn on dicta about the application of criminal-procedure rules to a hypothetical appeal.

[106] 791 F.3d 71, 73 (D.C. Cir. 2015).

[107] *Compare id.* at 82 (a writ of mandamus under 28 U.S.C. § 1651(a) serves the "traditional function of confining a court to its prescribed jurisdiction" (cleaned up)), *with Chaplaincy of Full Gospel*

from interference by the judicial and legislative branches — a principle the Supreme Court has upheld time and again.[108] The mandamus posture and military nature of the case make *al-Nashiri* inapposite.

*Third* — in *John Doe*, a party regulated by the Consumer Financial Protection Bureau sought a preliminary injunction to halt a CFPB investigation.[109] Over a dissent from then-Judge Kavanaugh, an emergency panel denied the requested relief in a non-precedential order.[110] It stated that a separation-of-powers violation is "not invariably an irreparable injury."[111]

If *John Doe* had been issued as a published opinion, or if the panel had later designated it for publication, stare decisis would require us to abide by its holding. But *John Doe* is an unpublished order.[112] That means it is "not suitable for

---

*Churches*, 454 F.3d at 297 ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981))).

[108] *See e.g.*, *Department of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs").

[109] *John Doe Co. v. CFPB*, 849 F.3d 1129, 1130-31 (D.C. Cir. 2017).

[110] *Id.* at 1135.

[111] *Id.*

[112] Review of the docket confirms this. *See* Order, *John Doe v. CFPB*, No. 17-5026 (D.C. Cir. Mar. 3, 2017).

Courts use the terms "published" and "unpublished" as terms of art to distinguish between (a) precedential opinions and (b) simple orders that do not bind future panels. It does not matter that West Publishing later put *John Doe*'s unpublished order in the Federal Reporter, without instruction from this court. Indeed, it would be

governing future cases" and does "not constrain a panel of the court from reaching a contrary conclusion in a published opinion after full consideration of the issue."[113]

Reliance on the (non-binding) order in *John Doe* is all the more curious considering that the *John Doe* dissent reads like a preview of *Axon*. Just as *Axon* held that it "impossible to remedy" the harm of "being subjected" to an "unconstitutional . . . proceeding by an unaccountable" decisionmaker "once the proceeding is over,"[114] the dissent in *John Doe* argued: "Irreparable harm occurs almost by definition when a person or entity demonstrates a likelihood that it is being regulated on an ongoing basis by an unconstitutionally structured agency that has issued binding rules governing the plaintiff's conduct and that has authority to bring enforcement actions against the plaintiff."[115]

---

ironic to allow the decision of a private corporation like West to determine the outcome of a case about whether FINRA is a private corporation executing federal law.

It also does not matter that other panels have cited *John Doe* "for seven years." Majority Op. at 36. Courts are free to cite dissents, essays, articles, books, and many other forms of persuasive (but non-binding) authority. And sometimes a precedential opinion will even adopt as its holding the reasoning of a nonprecedential authority. But that's not what happened to *John Doe*. The majority has not cited a single precedential opinion that incorporated *John Doe*'s reasoning into its holding. If a precedential opinion *had* done so, then the majority could simply rely on the holding of that precedential opinion without having to rely on *John Doe*. In other words, the majority's dependence on *John Doe* is itself evidence that no precedential opinions of our court have held what *John Doe* held.

[113] *In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011) (cleaned up); *see also* D.C. Cir. Rule 36(c)(2), (e)(2).

[114] *Axon*, 143 S. Ct. at 903.

[115] *John Doe*, 849 F.3d at 1136 (Kavanaugh, J., dissenting).

## V

The two remaining preliminary injunction factors also favor Alpine. "The public interest is not served by letting an unconstitutional[ ]" entity "continue to operate" and persist in violating a business's rights.[116] And the demonstrated violation of Alpine's constitutional rights tips the balance of equities in its favor, even if FINRA's enforcement goals will be impeded until the close of the collateral litigation.[117] Alpine has therefore shown both that the issuance of its requested injunction is "in the public interest" and that the "balance of equities tips" in its favor.[118]

\* \* \*

FINRA relies on a Goldilocks defense. It is too much like a private entity for Article II's strictures, yet too much like the government for the private nondelegation doctrine to apply.[119] But FINRA "cannot have its cake and eat it too."[120] Its split

---

[116] *See id.* at 1137.

[117] *See id.*

[118] *Winter*, 555 U.S. at 20.

[119] *Compare* FINRA Br. at 2 (arguing that the Constitution's appointment and removal requirements can't apply to FINRA because it is "a private corporation that the government did not create and *does not control*" (emphasis added)), *with id.* at 3-4 ("FINRA's rulemaking and disciplinary powers are *subject to extensive SEC oversight*, and thus satisfy the private nondelegation doctrine." (emphasis added)).

[120] *Amtrak I*, 721 U.S. at 676.

FINRA frequently seeks benefits traditionally reserved for the government, such as immunity from suit and compliance with its rules under the force of law. *See, e.g.*, *Gallagher v. FINRA*, No. 21-

identity fails to provide the accountability required by our Constitution. When federal law empowers officials to decide a company's fate, they must be Officers of the United States, selected through the Constitution's Appointments Clause and properly removable by the President.

The district court erred when it held otherwise. Because the majority correctly enjoins FINRA from unilaterally expelling Alpine and destroying its business, I concur in that part of its judgment. But I respectfully dissent from the majority's decision not to enjoin the expedited enforcement proceeding in its entirety.

---

13605, 2022 WL 1815594, at *2-3 (11th Cir. June 3, 2022) (granting FINRA immunity from suit because it was acting "under its delegated authority"); FINRA's Motion to Dismiss at 4, *Empire Financial Group, Inc. v. FINRA,* No. 9:08-cv-80534-KLR, 2008 WL 2717062 (S.D. Fla. May 21, 2008), ECF No. 2 ("Once approved by the SEC, FINRA rules enjoy the status of federal law.").